Robert C. Weaver, Jr., Bar #801350
E-Mail: rweaver@gsblaw.com
Paul H. Trinchero, Bar #014397
E-Mail: ptrinchero@gsblaw.com
Garvey Schubert Barer
Eleventh Floor
121 S.W. Morrison Street
Portland, Oregon 97204-3141
Telephone: (503) 228-3939
Facsimile: (503) 226-0259

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NIKE, INC., an Oregon corporation,<br><br>    Plaintiff,<br><br>v.<br><br>TUNG WING HO, KYLE KEOKI YAMAGUCHI, DENISE WEI-CHING YEE, SHU-CHU YAMAGUCHI, and JASON M. KEATING<br><br>    Defendants. | Case No._____<br><br>**COMPLAINT**<br><br>**(Lanham Act; Conversion; Fraud; Breach of Fiduciary Duty; Breach of Contract)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Nike, Inc. ("Plaintiff" or "Nike") brings this action against defendants Kyle Keoki Yamaguchi ("Yamaguchi"), Tung Wing Ho ("Ho"), Denise Wei-Ching Yee ("Yee"), Shu-Chu Yamaguchi ("Shu-Chu"), and Jason M. Keating ("Keating") (collectively, the "Defendants") based on the following allegations:

## INTRODUCTION

1.

In breach of the trust placed in them by Nike, defendants Yamaguchi and Ho used their position as managers at Nike to steal unique and/or custom athletic footwear in order to profit from the sale of those shoes to collectors of rare athletic shoes, known in the industry as "Sneakerheads." Yamaguchi and Ho lied to Nike and its manufacturers by misrepresenting that the shoes would be used for promotional and marketing purposes in order to trick them into manufacturing inventory for their illicit scheme. Defendant Keating acted as the middle-man in Yamaguchi and Ho's unlawful enterprise by knowingly purchasing and re-selling the stolen footwear obtained by Yamaguchi and Ho. To further assist them in their illegal endeavor, Yamaguchi and Ho recruited their significant others, Shu-Chu and Yee, who actively participated in the unlawful enterprise by transporting and storing the stolen athletic footwear and sharing in the illicit profits earned by Yamaguchi and Ho from sale of these stolen goods. As long time employees of Nike, Yamaguchi, Ho and Yee knew they were not authorized to order, take and sell Nike's promotional products for their own personal gain. Nike brings this action to recover the stolen shoes, recover the illicit gains obtained by Defendants from the sale of the stolen goods, to obtain an injunction preventing Defendants from continuing to participate in the illicit sale of stolen Nike goods, and to seek an award of punitive damages against Defendants Yamaguchi and Ho.

## PARTIES

2.

Nike is an Oregon corporation doing business at One Bowerman Drive, Beaverton, Oregon. Nike is the most recognizable athletic footwear and apparel company in the world.

3.

Defendant Yamaguchi was employed by Nike from 2006 until January 2012, when he

resigned to start his own sunglasses business, LookSee Goods LLC dba "Look/See." At Nike, Yamaguchi was a "Promo Product Manager." Yamaguchi is married to defendant Shu-Chu. Yamaguchi and Shu-Chu are residents of Multnomah County, Oregon.

4.

Defendant Ho is a former employee of Nike. He was first employed at Nike's Beaverton Campus in June, 2006 as a business planning analyst for Nike's US Footwear division. After two intervening positions, Ho became Yamaguchi's successor as Promo Product Manager in 2012. Ho was a Promo Product Manager until March 2014, when he was terminated for circumstances related to this litigation. Ho is a resident of Multnomah County, Oregon.

5.

Defendant Yee is a former employee of Nike. She worked for Nike for approximately six years in various roles in Corporate Accounting, and was a Demand Planning Analyst until March 2014, when she was terminated for circumstances related to this litigation. Yee is a resident of Multnomah County, Oregon.

6.

Defendant Shu-Chu is an optician and owner of 141 Eyewear in Portland, Oregon. She is married to and lives with Yamaguchi in Portland, Oregon and is a resident of Multnomah County.

7.

Defendant Keating is a high-end sneaker collector and reseller known in the online community of Sneakerheads as "Artaphax". He lives in Sanibel, Florida and is a resident of Lee County.

**JURISDICTION**

8.

This Court has subject-matter jurisdiction of this action pursuant to 28 U.S.C. § 1331

(federal question), in that Plaintiff's First Claim for Relief arises under the United States Trademark Act, Title 15 of the United States Code. This Court has supplemental jurisdiction over Plaintiff's state law claims of conversion, fraud, breach of fiduciary duty and breach of contract pursuant to 28 U.S.C. § 1367 because the claims are so related to the Lanham Act claim that they form part of the same case or controversy.

9.

This Court has personal jurisdiction over Defendants Yamaguchi, Ho, Yee and Shu-Chu because (1) they reside in the District of Oregon (the "District"), and (2) Defendants' illicit scheme as alleged herein was centered in this District, including the conversion and unauthorized sale of Nike products. Defendants' actions have caused substantial harm to Plaintiff within this District.

10.

This Court has personal jurisdiction over Defendant Keating because (1) Defendants' illicit scheme as alleged herein was centered in this District, (2) Defendant Keating has engaged in substantial activities in the State of Oregon as established by his frequent trips to this State for the purpose of participating in and furthering Defendants' illicit scheme, and (3) Defendant Keating's actions within and without the District have caused substantial harm to Plaintiff within this District.

**VENUE**

11.

Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because (1) Defendants Yee, Ho, Yee and Shu-Chu reside in this District, (2) a substantial part of the events giving rise to the claims in this action occurred in this District, and (3) Defendants are subject to personal jurisdiction in this District.

## FACTS COMMON TO ALL CLAIMS

12.

Certain Nike shoes styles, apart from their value and use as athletic equipment or leisure footwear, are valuable collectors' items. Those who collect sneakers such as Nike basketball shoes are referred to as Sneakerheads. Sneakerheads place value on the rarity or uniqueness of a particular product. Sneakerheads buy rare shoes via in-person cash purchases; online auction sites such as eBay; other online storefronts; direct person-to-person online transactions using payment platforms such as PayPal; physical storefronts; and Sneakerhead buy/trade/sell conventions. Social media, such as Instagram, email, and/or other online social media, are used to advertise collections or offer shoes for sale.

13.

At Nike, "Promo Product" consists of product created for promotional purposes and which are usually specially manufactured for an athlete, team, celebrity or influencer. Footwear Promo Product (hereinafter, "Promo Footwear") tends to be an existing style (either newly offered in the current or coming season, or an older style), but with new or unique color ways, materials or other treatments. Nike also produces shoes that are samples or prototypes of lines of shoes that are in development and have not yet been and may never be produced as retail products (hereinafter "Sample Footwear"). Sample Footwear may also be provided to an athlete, team, celebrity or influencer for promotional purposes prior to the release of the retail version of the footwear. Promo and Sample Footwear bear all the appearances and features of a fully produced Nike shoe, including its patents and trademarks and Nike's well-known "swoosh" mark that appears on all of the Nike-brand products, or the Michael Jordan "Jumpman" that appears on all Jordan Brand products. Nike authorizes Promo Footwear and some Sample Footwear to be provided to athletes, teams, celebrities or influencers for promotional and marketing purposes.

14.

Nike authorizes only a limited number of employees to order Promo and Sample Footwear from authorized Nike manufacturers. Only limited numbers of Promo and Sample Footwear may be ordered by these employees. Nike employees responsible for ordering Promo and Sample Footwear for the benefit of the company are not entitled to take it or to sell it for their own benefit. Since Promo and Sample Footwear is often rare or unique, it is highly sought after by Sneakerheads. Many of these shoes can command prices in the range of $1,000 to $10,000 or more in the collector market.

15.

As Promo Product Managers, Yamaguchi and Ho acted as agents of Nike and were authorized to place orders for Promo and Sample Footwear solely for promotional and marketing purposes. Nike paid for the Promo and Sample Footwear as part of its contract with the authorized manufacturer that produced the shoes.

16.

Between 2006 and 2012, as a Promo Product Manager, Yamaguchi abused and exceeded his authority as a Nike employee by ordering Promo and Sample Footwear for the purpose of misappropriating it for his own benefit (hereinafter "Stolen Footwear"). Instead of using the Stolen Footwear for promotional purposes authorized by Nike, Yamaguchi took the Stolen Footwear to his home in Portland or other locations controlled by Yamaguchi or his wife, Shu-Chu. Once in Yamaguchi's possession, Yamaguchi kept the Stolen Footwear for his own use or sold it to third parties such as Defendant Keating, and kept the proceeds of the sales for himself or shared the proceeds with other Defendants.

17.

As a Nike employee until 2012, Yamaguchi placed orders for the Stolen Footwear directly with Nike manufacturers in excess of the number required by Nike for promotional

purposes, in order to illicitly sell it to third parties for personal profit. Yamaguchi used Nike's computerized ordering system to place orders for Stolen Footwear. In doing so, Yamaguchi expressly represented that the shoes were being ordered for promotional purposes for the benefit of Nike. In fact, Yamaguchi's appropriation and sale of the Stolen Footwear was done without the authorization or knowledge of Nike. Yamaguchi's misappropriation of the Stolen Footwear and its sale to third parties, such as Defendant Keating, and collectors while he was still a Nike employee netted Yamaguchi considerable profits, at least in the hundreds of thousands of dollars.

18.

In 2012, Yamaguchi left his position with Nike to start a sunglasses company called "Look/See" (the name also used internally at Nike to refer to Sample Footwear). Yamaguchi handpicked Ho to succeed him as Promo Product Manager. Yamaguchi provided training to Ho in ordering products, and introduced him to his method of ordering excess Promo and Sample Footwear for use outside the scope of his job duties.

19.

Between 2012 and 2014, in concert with Yamaguchi, Ho ordered Stolen Footwear for the purpose of illicitly selling it to third parties for personal profit. Ho used Nike's computerized ordering system to place orders for Stolen Footwear. In doing so, Ho expressly represented that the shoes were being ordered for promotional purposes for the benefit of Nike. Ho ordered, received, and removed large quantities of Stolen Footwear from the Nike Campus. Ho transported Stolen Footwear to his home or to other locations controlled by him and/or his girlfriend, Yee, in or near Portland. Ho then transferred some or all of the Stolen Footwear to Yamaguchi, who maintained it at his home or other locations controlled by him or his wife, Shu-Chu. Subsequently, Yamaguchi delivered Stolen Footwear received from Ho to third parties, such as Defendant Keating, in exchange for money, the proceeds of which Yamaguchi shared with Ho.

20.

Defendant Keating knowingly assisted in the sale of Stolen Footwear obtained by Yamaguchi and/or Ho by acting as a "middle man" in Defendants' illicit scheme. In his role as middle man, Keating purchased the Stolen Footwear. Keating paid Yamaguchi for the Stolen Footwear by means of in-person cash transactions or wire transfers to Yamaguchi's bank account. The payments to Yamaguchi for Stolen Footwear typically ranged from $5,000 to $30,000. For larger payments, Keating would often travel to Portland, Oregon and make withdrawals from several different bank branches in order to accumulate the amount of cash needed to purchase the Stolen Footwear. These types of structured withdrawals and deposits are often used in illicit or criminal schemes to avoid detection by financial institutions and law enforcement. After Yamaguchi received payment from Keating, Yamaguchi would ship the Stolen Footwear from Oregon to Keating in Florida. Keating would often pay Yamaguchi a percentage of the profits he made from the sale of Stolen Footwear. Keating knew that the Stolen Footwear was obtained by Yamaguchi and/or Ho without Nike's knowledge or authorization, and shared in and benefitted from the proceeds of the unauthorized sales.

21.

Yee knowingly assisted in the sale of Stolen Footwear. As a Nike employee, Yee knew that taking Promo and Sample Footwear for personal gain was a violation of company policy. Nonetheless, Yee assisted Ho in transporting the Stolen Footwear to and from locations controlled by Ho, Yamaguchi, Shu-Chu or herself, including to and from the home Yee owns. Yee knew that the Stolen Footwear was being sold to third parties without Nike's knowledge or authorization, and shared in and benefitted from the proceeds of the unauthorized sales.

22.

On information and belief, Shu-Chu knowingly assisted in the sale of the Stolen Footwear taken by Ho and Yamaguchi from the Nike Campus. On information and belief, Shu-

Chu knew that the Stolen Footwear was being sold to third parties without Nike's knowledge or authorization, and shared in and benefitted from the proceeds of the unauthorized sales. Plaintiff alleges that Shu-Chu knowingly assisted Yamaguchi in the sale of the Stolen Footwear by allowing the shoes to be housed in her home and business.

### FACTS REGARDING NIKE TRADEMARKS

23.

Beginning in 1971, Nike has designed, manufactured, and sold athletic shoes, athletic apparel, and related merchandise in the United States and over time throughout the world identified with the name "NIKE," the "SWOOSH" logo, and other trademarks (collectively, the "Marks"). Nike owns and has registered the Marks, including the below selection, with the United States Patent and Trademark Office ("USPTO"):

| MARK | REGISTRATION NO. | GOODS IN INTERNATIONAL CLASS 25 |
|---|---|---|
| NIKE | 1214930 | Footwear |
| (Swoosh logo) | 1323343 | Footwear |

24.

Each of the trademark registrations in the preceding paragraph is valid and subsisting. Since registration, Nike has continuously used the Marks in connection with the advertising and sale of its athletic shoes, athletic apparel, and related merchandise in interstate, intrastate and foreign commerce, including commerce in the State of Oregon. True and correct copies of the certificates for the above registrations are attached to this Complaint as Exhibit 1.

25.

Nike has spent millions of dollars on advertising and promoting the Marks. Over the past 10 years, Nike has sold billions of dollars worth of authorized athletic shoes, apparel and related merchandise bearing the Marks.

26.

Through extensive advertising, promotion, sponsorships, celebrity endorsements, and resulting sales, Nike's Marks have attained exceptional prominence in the industry and worldwide renown with the public. In 2012, Forbes identified Nike as the most valuable sports brand in the world.

27.

Nike maintains strict control over the design and quality of its authorized athletic shoes, athletic apparel, and related merchandise identified with the Marks. Similarly, Nike maintains strict control over the channels through which its authorized athletic shoes, athletic apparel, and related merchandise are sold. Nike's control over the design, quality, and channels through which its authorized goods are sold serves to maintain the goodwill and reputation of the Nike brand and the value of the Marks.

## FIRST CLAIM FOR RELIEF

## COUNT 1 – TRADEMARK INFRINGEMENT UNDER LANHAM ACT § 32

28.

Plaintiff realleges and incorporates herein paragraphs 1 through 27.

29.

Defendants have, without Nike's authorization or consent, caused to be manufactured, imported, distributed, offered for sale and/or sold Stolen Footwear bearing Nike's Marks (the "Infringing Goods").

30.

Defendants' use of Nike's Marks and offering for sale, sale, and distribution of the Infringing Goods is likely to cause confusion, mistake and to deceive consumers.

31.

Defendants knowingly and willfully traded on the goodwill and reputation of Nike and the Marks.

32.

Defendants thus used unauthorized reproductions and copies of Nike's Marks in commerce in connection with the offer for sale, sale, and distribution of the Infringing Goods in violation of 15 U.S.C. § 1114.

33.

Defendants' conduct caused Nike damage in an amount to be proven at trial.

**COUNT 2 – TRADEMARK INFRINGEMENT UNDER LANHAM ACT § 43**

34.

Plaintiff realleges and incorporates herein the allegations of paragraphs 1 through 33.

35.

By causing the manufacture, importing, distributing, promoting, offering for sale and/or selling in interstate commerce of the Infringing Goods without Nike's authorization or consent, Defendants falsely designated Nike as the origin of the Infringing Goods and/or falsely represented the Infringing Goods as authorized and approved by Nike. Defendants' conduct was and is likely to cause confusion, and mistake, and to deceive consumers as to the affiliation, connection, and/or association of Nike with the Infringing Goods and/or Defendants, as well as the origin, sponsorship, and/or approval of the Infringing Goods by Nike.

36.

Defendants' conduct described above infringes Nike's Marks in violation of 15 U.S.C. § 1125(a).

37.

Defendants' conduct caused Nike damage in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### COUNT 1 – CONVERSION

38.

Plaintiff realleges and incorporates herein paragraphs 1 through 27 above.

39.

Defendants Yamaguchi and Ho exercised dominion and control over property owned by Nike by removing the Stolen Footwear from the Nike Campus for their own personal benefit and without the authorization of Nike.

40.

Yamaguchi and Ho's unauthorized exercise of dominion and control over the Stolen Footwear seriously interfered with Nike's property interest in the Stolen Footwear. Nike was deprived of its right of control over the Stolen Footwear, including but not limited to the right to possess, use and dispose of it.

41.

Yamaguchi and Ho's scheme took place over many years and was calculated to exploit the value of rare Nike shoes. The value misappropriated by Yamaguchi and Ho was created and safeguarded by Nike, which had policies in place for employees and others with access to valuable shoe designs to ensure that Nike's products would not be used for the personal gain of employees. However, Yamaguchi and Ho knew the great value to collectors of Nike shoes of particular designs and of limited product releases, and they undertook, in bad faith, an enterprise to exploit that value. By ordering the manufacture of the Stolen Footwear and distributing it to third parties without Nike's knowledge or permission, Yamaguchi and Ho asserted a right inconsistent with Nike's right of control over its property. As a result, Yamaguchi and Ho caused extensive and permanent harm to Nike and Nike's property. Based on the seriousness and extent of Yamaguchi and Ho's acts in depriving Nike of its property, Nike is entitled to the

full value of the converted Stolen Footwear as measured by the value received by Yamaguchi and Ho from the unlawful and unauthorized sale of the Stolen Footwear. In addition, Nike is entitled to recover the costs incurred to investigate Yamaguchi and Ho's conversion of the Stolen Footwear as well as pre-judgment interest on the value of the Stolen Footwear from the dates such goods were converted.

42.

All Defendants are jointly and severally liable for Yamaguchi and Ho's conversion of Nike's property. All Defendants knew that Yamaguchi and Ho's conversion of the Stolen Footwear wrongfully interfered with Nike's right to control its property. All Defendants further knew that sale of the Stolen Footwear to third parties for personal gain was done without the knowledge or permission of Nike. Nonetheless, all Defendants agreed to and did aid, abet, and act in concert with Yamaguchi and Ho to accomplish the conversion and sale of Nike property, and benefited materially therefrom.

43.

Plaintiff is entitled to punitive damages from Yamaguchi and Ho because these defendants acted with malice in conducting the scheme to profit from the conversion and unauthorized sale of rare Nike footwear and their actions demonstrate a reckless and outrageous indifference to the highly unreasonable risk of harm to Nike. Yamaguchi and Ho's unlawful scheme to convert and sell Nike shoes without Nike's authorization or knowledge was both outrageous and egregious.

### COUNT 2 – FRAUD

44.

Plaintiff realleges and incorporates herein paragraphs 1 through 27 above.

45.

Defendants Yamaguchi and Ho directly, or indirectly through Nike staff, used Nike's

computerized ordering system to order the Stolen Footwear to be manufactured and delivered to Nike as part of their scheme to keep or sell unauthorized Nike goods for their own personal benefit. In each order, Yamaguchi or Ho expressly represented that the Stolen Footwear were being ordered for promotional and marketing purposes, for the benefit of Nike. Yamaguchi and Ho failed to disclose to Nike that the Stolen Footwear was being ordered for their own personal gain and not for a legitimate promotional purpose designed to benefit Nike.

46.

Yamaguchi and Ho knew that they were not authorized to obtain shoes in the manner and for the purpose described herein. Yamaguchi and Ho knew that the representations that the Stolen Footwear was being ordered for promotional purposes were false.

47.

Yamaguchi and Ho intended for Nike and its agents and manufacturers to rely on their misrepresentations and omissions of material fact in order to obtain the Stolen Footwear for the unfair and unlawful purpose of selling the shoes to third parties without Nike's authorization.

48.

Nike's reliance on Yamaguchi and Ho's misrepresentations and omissions were reasonable given Defendants' positions at Nike as Promo Product Managers.

49.

Nike has been and continues to suffer damages as a direct and proximate result of Yamaguchi and Ho's actions. Nike is entitled to recover profits and illicit gains received by Defendants from the sale of the Stolen Footwear. Nike is further entitled to recover its costs in investigating and uncovering Yamaguchi and Ho's fraudulent conduct as well as prejudgment interest on Defendants' profits from the unauthorized sale of the Stolen Footwear from the dates such goods were sold.

50.

Nike is further entitled to an order and final judgment enjoining all Defendants and their agents, servants, employees, confederates and all persons acting in concert or participation with them from engaging in the misappropriation and unauthorized sale of Stolen Footwear as described herein.

51.

All Defendants are jointly and severally liable for Yamaguchi and Ho's fraud. All Defendants knew that Yamaguchi and Ho obtained possession of the Stolen Footwear through misrepresentations and omissions of material fact. All Defendants further knew that the sale of the Stolen Footwear to third parties for personal gain was not authorized by Nike. Nonetheless, all Defendants agreed to and did aid, abet, and act in concert with each other to accomplish the misappropriation and sale of Nike property, and benefited materially there from.

52.

Plaintiff is entitled to punitive damages from Yamaguchi and Ho as a result of their fraudulent conduct. Yamaguchi and Ho's unlawful scheme to obtain and sell Nike shoes by defrauding Nike was both outrageous and egregious.

## COUNT 3 – BREACH OF FIDUCIARY DUTY

53.

Plaintiff realleges and incorporates herein paragraphs 1 through 27 above.

54.

Defendants Yamaguchi, Ho and Yee each owed their employer, Nike, the fiduciary duties of honesty, loyalty, good faith and fair dealing during the course of and within the scope of their employment. Defendants Yamaguchi and Ho breached the fiduciary duties owed to Nike during their employment by obtaining the Stolen Footwear for their own personal benefit without Nike's authorization. Defendant Yee breached her fiduciary duties to Nike during her

employment by knowingly assisting Ho and/or Yamaguchi in the misappropriation and sale of the Stolen Footwear.

55.

Nike has been and continues to suffer damages as a direct and proximate result of Yamaguchi, Ho and Yee's actions. Nike is entitled to recover profits and illicit gains received by Defendants from the sale of the Stolen Footwear. Nike is further entitled to recover its costs in investigating and uncovering Yamaguchi and Ho's breach fiduciary duties as well as prejudgment interest on Defendants' profits from the unauthorized sale of the Stolen Footwear from the dates such goods were sold.

56.

Nike is further entitled to an order and final judgment enjoining all Defendants and their agents, servants, employees, confederates and all persons acting in concert or participation with them from engaging in the misappropriation and unauthorized sale of Stolen Footwear as described herein.

57.

All Defendants are jointly and severally liable for Yamaguchi, Ho and Yee's breaches of fiduciary duty. All Defendants knew that Yamaguchi and Ho obtained possession of the Stolen Footwear in breach of the fiduciary duties owed to their employer. All Defendants further knew that the sale of the Stolen Footwear to third parties for personal gain was not authorized by Nike. Nonetheless, all Defendants agreed to and did aid, abet, and act in concert with each other to accomplish the misappropriation and sale of Nike property, and benefited materially therefrom.

## THIRD CLAIM FOR RELIEF

### BREACH OF CONTRACT

### (Yamaguchi, Ho & Yee)

58.

Plaintiff realleges and incorporates herein paragraphs 1 through 27 above.

59.

Defendant Yamaguchi was employed by Nike from July 2006 through January 2012. At the outset of his employment by Nike, Yamaguchi agreed to comply with the policies and guidelines set forth by Nike.

60.

Defendant Ho was employed by Nike from April 2005 through March 2014. At the outset of his employment by Nike, Yamaguchi agreed to comply with the policies and guidelines set forth by Nike.

61.

Defendant Yee was employed by Nike from July 2007 through March 2014. At the outset of her employment by Nike, Yee agreed to comply with the policies and guidelines set forth by Nike.

62.

Among the policies and guidelines each of these Defendants agreed to abide by are Nike's strict written policy against fraud, theft and conflicts of interest.

63.

Defendants Yamaguchi and Ho breached the contractual obligations they owed to Nike during their employment by obtaining the Stolen Footwear for their own personal benefit without Nike's authorization. Defendant Yee breached her contractual obligation owed to Nike during

her employment by knowingly assisting Ho and/or Yamaguchi in the misappropriation and sale of the Stolen Footwear.

64.

Nike has been and continues to suffer damages as a direct and proximate result of Yamaguchi, Ho and Yee's breach of their contractual obligations. Nike is entitled to recover profits and illicit gains received by Defendants from the sale of the Stolen Footwear. Nike is further entitled to recover prejudgment interest on Yamaguchi, Ho and Yee's profits from the unauthorized sale of the Stolen Footwear from the dates such goods were sold.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Nike, Inc., an Oregon corporation, respectfully requests that this Court enter final judgment and permanent injunctive relief in favor of Nike and against Defendants Kyle Keoki Yamaguchi, Tung Wing Ho, Denise Wei-Ching Yee, Shu-Chu Yamaguchi and Jason M. Keating as follows:

a. On Plaintiff's First Claim for Relief, awarding Nike its compensatory, consequential, statutory, and special damages including, without limitation, Defendants' profits from the sale of Stolen Footwear, as provided by law, together with pre and post judgment interest, investigative costs, and reasonable attorney fees and costs;

b. On Plaintiff's Second Claim for Relief, awarding Nike its compensatory, consequential, and punitive damages including, without limitation, Defendants' profits from the sale of Stolen Footwear, as provided by law, together with pre and post judgment interest, and investigative costs;

c. On Plaintiff's Third Claim for Relief, awarding Nike its compensatory, consequential, and punitive damages, including, without limitation, Defendants' profits from the sale of Stolen Footwear, as provided by law, together with pre

and post judgment interest

d. Permanently enjoining Defendants and their agents, servants, employees, confederates and all persons acting in concert or participation with them from engaging in the misappropriation and unauthorized sale of Stolen Footwear as described in this Complaint;

e. Awarding to Nike restitution of all money and property unfairly and unlawfully obtained by Defendants as a result of the sale of Stolen Footwear; and

f. Granting Nike such further and other relief as the Court deems just and proper.

DATED this 28th day of April, 2014.

GARVEY SCHUBERT BARER

By _____
Robert C. Weaver, Jr., Bar # 801350
Telephone: (503) 228-3939
Fax: (503) 226-0259
E-Mail: rweaver@gsblaw.com
Paul H. Trinchero, Bar # 014397

PDX_DOCS:514799.9 [32614.00500]

COMPLAINT
Page 19 of 19